## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

BRIGHTON CROSSING CONDOMINIUM ) 
ASSOCIATION, ET AL., )

      Plaintiffs, )

v. )      No. 15-00887-CV-W-FJG

AMERICAN FAMILY MUTUAL INSURANCE )
COMPANY, )

      Defendant. )

## <u>ORDER</u>

Currently pending before the Court is plaintiffs' Motion for Summary Judgment (Doc. # 101); Defendant's Motion for  Summary Judgment (Doc. # 104); defendant's Motion to Exclude Plaintiffs' Experts (Doc. # 106); defendant's Motion to  Exclude Untimely Disclosed Evidence of Repairs or Alternate Motion to Re-Open Discovery (Doc. # 125); defendant's Motion to Strike Declaration of Robert Kitto (Doc. # 127) and defendant's Motion to Strike Expert Opinion and Testimony of Tom Pendleton (Doc. # 133).

### I. BACKGROUND

Plaintiffs are a condominium association and a homeowners' association that collectively manage twelve condos and twenty-four row homes. Brighton Crossing Condominium Association purchased an insurance policy from American Family with a policy period from April 23, 2014, to April 23, 2015. Brighton Crossing Homeowners Association also purchased an insurance policy from American Family with coverage for the same dates. The policies provided various coverages for the properties including

hail and wind damage. The properties suffered damage from a May 10, 2014 hailstorm. The first notice of loss of property damage was provided to American Family on May 19, 2014. Arrow HOA was serving as the property management company for Brighton Crossing. Throughout 2014, Danny Davis served as the property manager for Brighton Crossing. Davis and another workman attended the inspection with the American Family agents.

### Examination of the Roofs

The American Family agents used a sampling approach to estimate the damage to the properties – the roofs of two Condo buildings and four Row Homes that faced different directions were used. Mr. Davis accompanied the inspectors and observed the damage to the roofs first hand. The adjustors pointed out examples of soft metal damage that they observed on the roofs and explained that this damage was considered hail damage. Mr. Davis testified that his focus was on the roofs, but he was not waiving the right to recover for the soft metal damage. The adjustors marked off a 10 x 10 area with chalk on each slope of the roofs. Once the test square was drawn on the roof, the adjustors circled each hail hit per shingle and marked any wind damaged shingles with an "X." After completing this process, the adjustors counted and documented the number of damaged shingles within the test square. The adjustors identified on average, five damaged shingles per test square on the south and west slopes of the condos and three damaged shingles per test square on the south and west slopes of the row homes. The adjustors then applied a formula to determine whether it was more functionally and economically feasible to repair the damaged shingles or replace all of the shingles on entire slopes of the roofs. At the time of the

inspection, the roofs were approximately 4-5 years old, in average condition and had a life expectancy of 20 -25 years.

Adjusting a roofing loss requires an evaluation of individual slopes, as well as the roofing system as a whole. To determine the repair/replacement of a slope, an adjustor first needs to determine the repair difficulty factor (RDF) for the roof. RDF is a multiplier used to take into consideration the increased difficulty of repairing a roof as it deteriorates. The RDF is based on the depreciation decision the adjustor reaches taking into consideration the age, life expectancy and overall condition of the roof. Under American Family's 2014 Guidelines, an RDF of 1.0 was used. Based on this, American Family's Guidelines called for replacement of the shingles on an entire slope of the roof if there were nine or more damaged shingles within the test square on the slope. If the amount of slopes being replaced exceeds 50% of the total area of the roof, then the decision should be reached to replace the entire roof. Thus, the adjustors concluded that it was appropriate to repair only the damaged shingles, as opposed to replacing all of the shingles on entire slopes of the roofs.

### Haag Engineering

Haag Engineering is a company that evaluates damage to residential, commercial and industrial roofing. Haag developed a protocol for assessing hail-impact damage to steep slope roof systems. This protocol states as follows:

> . . .
> Hail damage is quantified by examining test areas on directional roof slopes to determine the number of damaged shingles/shakes per roofing square. The difficulty in making roof repairs is incorporated via repair difficulty factor. Finally, the decision to repair or replace hail-damaged roofing is made on an economical basis by comparing expected costs to remove damaged shingles/shakes versus costs to replace roofing on entire slopes.

3

Repair Cost  Formula

The repair cost formula provides a method to determine whether it is more economical to repair individual shingles or shakes or replace the hail-damaged roof covering on the entire slope. The formula is expressed as follows:

$RC = D \times U \times R \times A$

RC = the cost to repair the entire slope (in dollars)
D = the number of damaged shingles or shakes per roofing square
U = the unit cost to repair a shingle or shake (in dollars)
R= the repair difficulty factor
A = the actual area of the slope (in roofing squares)

The repair cost of a roof slope is based on the number of hail-damaged units per square multiplied by the unit cost of the repair and the area of the slope in squares. Unit repair costs vary by type of roof covering and other factors.
. . .

## **Plaintiffs' Insurance Policies**

Section I, E. 5, of the insurance policies expressly provides American Family with the option of, among other things, selecting whether it would repair or replace the damaged shingles and siding of the properties.  The section of the policy states:

5. Loss Payment

In the event of loss or damage covered by this policy:

a. At our option, we will either:
(1) Pay the value of lost or damaged property;
(2) Pay the cost of repairing or replacing the lost or damaged property;
(3) Take all or any part of the property at an agreed or appraised value; or
(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to Paragraph d.(1)(e) below.

b. We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

c. We will not pay you more than your financial interest in the Covered Property.

4

d. Except as provided in Paragraphs (2) through (7) below, we will determine the value of Covered property as follows:

(1) At replacement cost without deduction for depreciation, subject to the following:

(a) If, at the time of loss, the Limit of Insurance on the lost or damaged property is 80% or more than the full replacement cost of the property immediately before the loss, we will pay the cost to repair or replace, after application of the deductible and without deduction for depreciation, but not more than the least of the following amounts:

(i) The Limit of Insurance under Section I – Property that applies to the lost or damaged property;

(ii) The cost to replace, on the same premises, the lost or damaged property with other property;

   i. Of comparable material and quality; and
   ii. Used for the same purpose; or
   iii. The amount that you actually spend that is necessary to repair or replace the lost or damaged property.
. . .

(d) We will not pay on a replacement cost basis for any loss or damage:

(i) Until the lost or damaged property is actually repaired or replaced; and

(ii) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

**Examination of the Siding**

Any piece of vinyl siding that was observed to have suffered a hail strike was noted in the repair estimate to include the cost of installing a new piece of vinyl siding. During the inspection, the adjustors also identified damage to the soft metals, gutters, and air conditioning units of the properties. The adjustors informed Davis of the damage to the soft metals, gutters, carports and AC units of the properties and asked if Davis wanted this damage included in the estimate. Davis advised the adjustors that he did

5

not want those items included, because he was more concerned about the damage to the roofs.  However, Davis stated that he was not waiving his right to recover for the soft metal damage in the future or address it at a later time.

After examining the damage, the adjustors concluded that the damage to the properties could all be repaired. The adjustors concluded that the cost of repairs to the condos came to $11,562.29, which fell below the $12,550 deductible. The adjustors concluded that the cost of repairs to the row homes came to $30,330.03.  The row homes carried a $5,000 deductible. The adjustors determined that a payment of $25,330.03 was owed to plaintiffs.  On June 9, 2014, plaintiffs received and cashed a check from American Family for $25,330.03.

On July 15, 2014, ITEL Laboratories sent Task Construction a report indicating that a match for the piece of Vintage Wicker siding was available from the original manufacturer, Alside Supply Center.

**Plaintiffs Request for Reconsideration of the Claim**

On September 19, 2014, American Family adjustor Lynn Urzendowski received a letter from an employee of the Home Owners  Association, Brian Stegall, asking that American Family reconsider the claim for hail to all 36 properties. The letter indicated that the Home Owners Association was disputing the initial inspection report and they had hired their own engineers, independent adjusters and appraisers – Task Construction.  Included with the letter were three estimates, for one each type of property at Brighton Crossing – condo, 3-unit row home and 4-unit row home.  Ms. Urzendowski emailed Mr. Stigall and asked for copies of the reports and stated that after reviewing the reports, American Family would review the claim for reconsideration.

6

Urzendowski and Stigall exchanged voicemails and emails regarding American Family's request for the materials, but Stigall never provided the engineering reports, independent reports or appraiser reports. On October 9, 2014, Davis informed Urzendowski that the Homeowner's Association had terminated Stigall's employment. Subsequently, Urzendowski forwarded to Davis her correspondence with Stigall as well as copies of American Family's initial repair estimates. On November 11, 2014, Urzendowski emailed Davis to inquire if she should keep the roof claims open for Brighton or close them out. On February 2, 2015, after receiving no response, Urzendowski closed the file. The same day, Urzendowski received an email from an attorney requesting that the claim not be closed and advising that plaintiffs had hired an attorney to pursue their rights under the claim. On April 15, 2015, counsel for plaintiffs sent a demand letter to American Family requesting that within 30 days, American Family pay $3,395,851.51 in economic damages and $1,144,337.47 in expenses, including attorney fees. On April 21, 2015, American Family responded to the demand and asked for an additional thirty days to respond and asked to re-inspect the properties with a qualified engineer.

**Reinspection of the Properties**

American Family hired Haag Construction Consulting to reevaluate the damage to the properties. American Family hired an outside adjuster in order to get a second opinion. On May 14, 2015, Mark O'Connor and Frank Simones of Haag Construction inspected the building with Urzendowski and plaintffs' attorney in attendance. Haag recorded ten pages of scope notes tracking its findings and took approximately 1,420 photographs consisting of building rooftops and elevations. Haag concluded that the hail

7

and wind damage to the shingles could be repaired. Haag also inspected the exterior elevations of the properties and took notes and photos related to the siding and the number of pieces of siding per elevation that had incurred hail damage.  Haag concluded that it was functionally and economically feasible to replace the damaged pieces of siding (as opposed to entire elevations).  Haag estimated that the total cost to repair all storm related damages identified during their inspection of the properties in May 2015 was $226,694.28.

On July 2, 2015, American Family sent a letter to plaintiffs offering to settle the claims for $226,694.28 minus the prior payments and accounting for the deductibles, which totaled $174,801.96.  Plaintiffs never responded to the July 2, 2015 letter and filed suit on November 12, 2015. Due to a mathematical mistake in American Family's calculations, American Family tendered a payment to plaintiffs in the amount of $183,809.25 on May 6, 2016. This payment represented the additional sum due per the Haag Construction estimate.

The Complaint filed by plaintiffs never alleges a color matching issue with the roofs, siding or gutters. Davis testified that he did not initially have concerns regarding matching of the shingles or vinyl siding at the outset.  The letter that Brian Stigall sent to American Family did not describe a matching issue with regard to any damage to the properties.  The Task Construction repair estimates omit any description of a color matching issue for the shingles, vinyl siding or gutters.

### Plaintiffs'' Expert - Robert Kitto

Robert Kitto is plaintiffs' expert who expressed an opinion that it would be impossible to match the color of the new siding with the old siding.  Kitto is not a color

8

expert. Kitto expressed an opinion that American Family's adjustors missed obvious signs of property damage and therefore mishandled the claim. Kitto testified that the roof damage was so extensive that it warranted a full replacement of each roof for all 36 buildings. Kitto testified that he took photographs of the damage to each roof but he was unable to produce the photographs. Kitto did not document the number of hail strikes that he observed on the roof or hail damage to the siding. Kitto conducted a visual inspection of the roofs and concluded that the damage was "obvious" and there was enough damage to require total replacement of the shingles. In October 2016, Kitto submitted three siding samples to ITEL[1]. The three ITEL reports indicate that the original pieces of vinyl siding are available for purchase and installation. The names of the colors for the original pieces of vinyl panel siding used on the properties are: Vintage Wicker, Antique Parchment and Tuscan Clay. These same colors of siding are still available from Alside Supply.

The type of roof shingle installed on the properties was an Owens Corning Supreme. The color of the roof shingle was Driftwood. The same type and color of shingle is still offered for sale. The color of the gutters used on the properties was Standard White. The same color of guttering is still offered for sale.

## II. STANDARD

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the

---

[1] ITEL Laboratories, is a third-party testing lab.

outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party meets this requirement, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. 242, 248 (1986). In Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court emphasized that the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts" in order to establish a genuine issue of fact sufficient to warrant trial. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushia, 475 U.S. 574, 588; Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985).

### III. DISCUSSION

**A. American Family's Motions to Exclude Experts**

Under Fed.R.Evid. 702, a "witness properly qualified as an expert may testify in regard to their 'scientific, technical, or other specialized knowledge' so long as it serves to 'assist the trier of fact to understand the evidence or determine a fact in issue.' Fed.R.Evid. 702." Alberternst v. Hunt, No. 4:10-CV-642-JAR, 2011 WL 6140888, *6 (E.D.Mo. Dec. 9, 2011). District courts also act in the role of a "gatekeeper" to ensure that only relevant and reliable opinion testimony is admitted. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579,589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). "This question of whether 'an expert's testimony both rests on a reliable foundation and is relevant to

the task at hand' is known as the 'reliability and relevancy' test." <u>Lipp v. Ginger C, LLC</u>, No. 2:15-cv-04257-NKL, 2017 WL 277613, *2 (W.D.Mo. Jan. 19, 2017)(quoting <u>Russell v. Whirlpool Corp.</u>, 702 F.3d 450, 456 (8th Cir. 2012)).

 In <u>Khottavongsa v. City of Brooklyn Center</u>, No. 16-cv-1031 (RHK/DTS), 2017 WL 3822877 (D.Minn. Aug. 30, 2017), the Court stated:

> To determine reliability, the Court should examine (1) whether the theory or technique can be and has been tested, (2) whether it has been subjected to peer review and publication, (3) the known rate of potential error, and (4) whether the theory or technique has been generally accepted.

<u>Id</u>. at *4 (citing <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. at 589). In Lipp, the Court stated:

> The <u>Daubert</u> standard is "flexible" and the above factors are guidelines rather than "a definitive checklist." <u>Jauregui v. Carter Manufacturing Company, Inc.</u>, 173 F.3d 1076, 1082 (8th Cir.1999). The expert's testimony must at the very least satisfy "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," but "whether <u>Daubert's</u> specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." <u>Kumho Tire</u>, 526 U.S. at 151,153.

<u>Id</u>. at *2. "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." <u>Lauzon v. Senco Prods., Inc.</u>, 270 F.3d 681,686 (8th Cir.2001)(citing <u>Daubert</u>, 509 U.S. at 592).

**1. Robert Kitto**

American Family seeks to exclude the following initial opinions of Robert Kitto:

• That all slopes of all roofs of the properties required replacement.

• That the replacement siding was not a "match" to the original, thus requiring total replacement of the siding.

• The total cost to perform the suggested repairs or replacements.

11

• The date of the storm that caused the damage to the properties.

• The legal opinion that the damage was "covered" by the policies.

•Whether American Family adjustors acted unreasonably or in bad faith.

American Family also seeks to exclude a second declaration of Kitto's dated April 24, 2017. American Family seeks to exclude the following opinions from the second declaration:

• New opinions that claim that all of damage was caused by the May 10, 2014 hailstorm

• New opinions regarding industry standards for insurance adjusters

• Statements contradicting Kitto's previous sworn deposition testimony

American Family seeks to exclude the testimony of Robert Kitto because there is no competent evidence of how Kitto arrived at his conclusions or that he utilized and properly applied reliable methods and principles to do so. American Family states that Kitto admitted during his deposition: (1) he lost any photographs that he may have taken of the shingles; (2) he threw away any notes that he took during the inspections; (3) he could not recall the specific amount of damage that he observed to a single one of the properties he inspected; (4) he applied no specific formula or methodology to determine whether the amount of damage to the properties warranted total replacement of the shingles and siding and (5) he made no effort to determine whether the hail damage he observed was even caused by the May 10, 2014 hailstorm.

In his Supplemental Declaration dated August 17, 2016, Kitto states that he is a licensed Public Adjuster in the State of Missouri and has been adjusting claims since the 1990s. Kitto states that he is a principal of K2 Consulting & Services LLC and has extensive experience adjusting property claims of the type at issue in this case. Kitto

states in his Supplemental Declaration that it is his opinion that "American Family's adjusters and consultants underestimated and/or ignored obvious covered damaged [sic] that a reasonable adjuster or consultant, acting in good faith, would not have ignored." (Supp. Decl. ¶ 5). Kitto states that it is "my opinion that all damages identified in the estimate and photographs contained in the bates labeled documents "Brighton 001297-001692" pertaining to the early 2014 loss are covered under Brighton Crossings' insurance policy." (Supp. Decl. ¶ 7).

American Family objects to Kitto's report because he never actually identifies the nature and the amount of the hail damage that he observed to the properties. With respect to the roof shingles, his report contains no information and no photos regarding the specific amount of hail damage he observed to the shingles of even a single roof. In his deposition, Kitto testified that during his December 2014 inspection, he visually inspected all of the roofs and vaguely recalled taking photographs of the hail damage. Although when asked where the photographs were, Kitto did not know. He responded that the photos are uploaded to Xactimate (a software estimating program that he uses) but for some reason the roofing photographs did not get stored in the program. Kitto testified that he didn't track the number of hail strikes that he noted on the roofs, siding, the gutters or carports because the damage was "substantial enough where I didn't need to do that." (Kitto Depo. p. 28). Kitto stated that he had no tabulation of the number of hail strikes on the roofs or perforations to the vinyl siding. (Kitto Dep. p. 106). Kitto was asked:

Q. Okay. Can you point to me anywhere in this first report that would indicate how many hail strikes you identified on the roofs of the 36 buildings?
A. Well, I – when I inspected the properties, it was evident to me that the roofs had sustained enough damage to warrant replacement of the roofs.

Q. I don't think that answered my question. Is there anything you can point to in this report that would identify the number of hail strikes that you found for each property in the 36-building complex?

A. I didn't do – I mean, I didn't rely on hits per square or this arbitrary made up thing. I'm looking at the –the totality of the damage.

Q. Okay. I think before you testified that you might – you might feel that it's necessary to replace an entire roof, even if there's just one hail strike; is that correct?

A. That's correct.

Q. Okay. So underneath your line of reasoning, you don't need to take notes about anything, correct?

. . .

A. Well, my notes are my – the notes are my estimates.

Q. (By Mr. Fletcher) Thank you for clarifying. But you didn't feel it was necessary to take notes of the actual signs of hail damage that you observed when you were doing your inspections of the roofs?

A. The damage was so obvious that it wasn't necessary. And I also had the pictures from the engineer reports that were –I thought were very good.

Q. All right. So the answer to that – my prior question is no?

. . .

A. I did not take handwritten notes that I kept.

(Kitto Depo. pp. 106 -108).

With regard to the vinyl siding, Kitto submitted three samples of the existing vinyl siding to ITEL to see if the color was still manufactured. The ITEL reports show that all three colors of siding are still manufactured by Alside Supply in the original color and are available for purchase. Kitto testified that it was his opinion that there was a degree of fading on the existing siding compared to the new siding in the same colors. Kitto testified that he arrived at this conclusion by visually comparing a color wheel of the siding provided to him by Alside with sections of siding from plaintiff's properties. However, Kitto did not retain the color wheel that Alside gave to him and he did not photograph the comparison of the two pieces of siding. When asked what his conclusion was of the comparison of the sample colors to the existing siding, Kitto stated that he thought there was a high degree of fade in the Vintage Wicker color. With regard to the other two colors, there was some fade, but it was not as noticeable

14

with those two colors. (Kitto Depo. pp. 56-59).

 With regard to the siding, the report again fails to detail how much hail damage he observed. Kitto does include some photos in this section of his report, but the report frequently utilizes the same photographs depicting siding damage of one property as "proof" of siding damage for different properties.

Q. Will you look at Brighton 1516.  And so the record's clear, Brighton 1516 is reflecting 8100 North Oakley Avenue. Take a look at the pictures on Brighton 1516, 1517, 1518 and 1519.  Do they look like some of the photos that have been previously used in your report?
A. That's correct.
Q. And these are the same photographs used again and again.  Correct?
A. That's correct.

(Kitto Depo. p. 210).

 In opposition to American Family's Motion to Exclude Kitto, plaintiffs state that his opinions are the product of reliable principles and methods because he visually inspected the roofs, as did American Family's adjustors and experts. Plaintiffs argue that the way in which Kitto performed his investigation is subject to cross-examination and should not be a basis for exclusion.  Plaintiffs argue that Kitto's opinions regarding the siding are also reliable because he relied on an industry approved method - the ITEL reports. His interpretation of the reports plaintiffs argue is a subject for cross-examination, not exclusion.  With regard to the cost estimates, plaintiffs argue that Kitto utilized Xactimate software, which is the same software utilized by American Family's experts.  Again plaintiffs argue that challenging Kitto's inputs for the program is a subject for cross-examination and is not a basis for exclusion.  Plaintiffs also argue that Kitto's testimony will help the jury understand the evidence because there are conflicting opinions regarding the damage to the shingles, Kitto can assist the jury in

15

understanding the ITEL reports regarding the fading of the siding and he can explain to the jury why he used the inputs he did for the cost estimates. Plaintiffs also state that Kitto may testify to the causation of the storm damage because he can link it to weather reports regarding the storm which showed that there were hail stones of 1.75 to 2.75 inches and high winds. With regard to Kitto's opinions regarding the insurance policies, plaintiffs state that he will not opine on how the policies should be interpreted, but rather that the damage he observed is typically included in an estimate for property damage. Finally, as to Kitto's opinions regarding American Family's conduct and standard of care, plaintiffs state that this testimony is admissible because Kitto is not stating that these particular adjustors acted in bad faith, rather he seeks to testify that the adjustors "underestimated and/or ignored obvious damage" and that a reasonable insurance adjustor would not have ignored obvious damage.

As noted above, with regard to reliability, courts look at the four nonexclusive Daubert factors: 1) whether he theory or technique can be (and has been) tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate or error and 4) whether the theory has been generally accepted. Most of these factors are not applicable however because Kitto did not identify what he relied on in forming his opinion that the entire roofs on all the properties needed to be replaced. Kitto admitted that he had no total of the number of hail strikes on the roofs of each of the buildings and did not rely on hits per square.

Q. Okay. Can you point to me anywhere in this first report that would indicate how many hail strikes you identified on the roofs of the 36 buildings?
A. Well, I – when I inspected the properties, it was evident to me that the roofs had sustained enough damage to warrant replacement of the roofs.
Q. I don't think that answered my question. Is there anything you can point to in this report that would identify the number of hail strikes that you found for each property in

the 36-building complex?

A. I didn't do – I mean, I didn't rely on hits per square or this arbitrary made up thing. I'm looking at the –the totality of the damage.

(Kitto Depo. pp. 106-107).

In the Advisory Committee Notes to Fed.R.E. 702, the Committee noted:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it." See Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1319 (9th Cir.1995).

In the instant case, Kitto did not take any photos of the hail damage to the roofs and he had no handwritten notes regarding the number of hail strikes that he observed. When asked why he didn't feel that it was necessary to take any notes, he responded that "[t]he damage was so obvious that it wasn't necessary." (Kitto Depo. p. 107). However, what Kitto has failed to do it to explain how his experience leads to his conclusion that the damage was "so obvious." The Court finds that Kitto is simply asking the Court to "take his word for it." Kitto also argues that his opinion that the entire roofs needed to be replaced was also supported by the reports and photographs prepared by DOTec and Foundation Engineering. However, DOTec and Foundation Engineering only inspected six of the different roofs and these reports contain no calculations or information about the specific damage that the roofs suffered. Additionally, neither report states that the hail damage was so extensive that it required total replacement of all of the roofs on all the properties. The Court finds that because Kitto failed to rely on any methods or principles in analyzing the roof damage and because he had no notes or photos or anything else supporting his observations of the

17

damage to the roofs, his conclusions are unreliable.

Kitto's second opinion is that all of the siding on all of the properties must be replaced because replacement siding would not match the original siding. Kitto submitted three samples of siding from the properties to ITEL testing lab. The reports show that for the three different colors submitted, there was minimal fading to the original siding from the properties and that there is a matching product from the original manufacturer. The comments state: "The color is the same as the original color of your siding." The reports contain a chart showing a range of how close the two colors are. The range goes is from 1 which would be the same color to 5 which would be a different color. The result shows that there is only a slight difference between the original siding and the replacement siding. The results are the same for the other colors of siding. However, instead of relying on the ITEL report, Kitto went to Alside (the original siding manufacturer), and obtained a color wheel. Kitto then compared the colors on the color wheel to the sample of original siding that he had been sent. Kitto's conclusion after comparing the two was "[t]here was a – what I felt was a high degree of fade in the – in the siding in this Vintage Wicker." When asked about the other two colors, Kitto responded that "[t]he other two colors, they were like white, lighter in color. The fade was not as noticeable on that." (Kitto Depo. p. 57). However, Kitto did not retain the color wheel nor did he retain the sample pieces of siding that he used for the comparison test. Kitto also did not take any photographs of his comparison of the siding colors. (Kitto Depo. pp. 56-59). Once again, Kitto did not rely upon tests or techniques nor did he utilize anything other than his own visual inspection to determine that the colors of the siding samples did not match and that there had been significant degree of

fading to the siding. Again, the Court finds that the lack of any objective testing or analysis makes Kitto's opinions unreliable. Additionally, the Court finds that Kitto's opinions are not relevant, because determining how close of a match the original siding is to the replacement siding is something that a juror would be capable of analyzing and determining for themselves.

Kitto also offers his opinion that "all damages identified in the estimate and photographs contained in bates labeled documents "Brighton 001297-001692" pertaining to the early 2014 loss are covered under Brighton Crossings' insurance policy." American Family argued that Kitto's failure to apply reliable methods to identify the amount of hail and wind damage the properties incurred and whether this damage was repairable undermines his estimate regarding the amount of benefits. American Family states that Kitto admitted that he did not rely on his notes or any photos of the damage to the property to prepare his estimate and he instead assumed that all of the shingles and all of the siding on all of the properties needed to be replaced. He put the dimensions into the Xactimate estimating software and the software program "spit out" a price to replace all of those materials. American Family argues that because Kitto failed to reliably evaluate whether any of the properties actually required new shingles or new siding, his estimates lack reliability as well. The Court agrees and finds because the methods that Kitto utilized for estimating the damage to the properties were not reliable, his opinion that all of the damages are covered should also be excluded. American Family argues that Kitto should not be able to testify regarding causation of the damage to the properties because he does not have any meteorological qualifications. Plaintiffs argue that linking storm damage to weather reports reflecting

recent storms is the usual method and practice of storm damage adjusters. Additionally, plaintiffs argue that weather reports for the May 2014 storm reflect that there were hail stones ranging from 1.75 inches to 2.75 inches as well as high winds. Thus, plaintiffs state that Kitto's testimony regarding the cause of the storm is proper. The Court in ABM Investments LLC v. Farmers Alliance Mutual Insurance Co., No. Civ.-15-0363-HE, 2016 WL 5373491 (W.D.Okla. Jan. 21, 2016), addressed a similar issue with regard to an expert witness. In that case the Court stated that a roofing expert would be allowed to testify to what he observed on the dates of his inspection, but would not be allowed to opine that what he observed was due to a particular storm. The Court found that the expert's expertise did not extend to analyzing weather data or records and the Court found that he was in no position to identify a particular storm as having caused whatever he observed on the dates that he conducted his inspections. The Court agrees and finds that Kitto is not qualified to offer any opinions on the causation of the damage to the properties.

American Family also seeks to exclude Kitto's opinions that the damage to the properties was a "covered loss" and also any opinion that the American Family adjustors acted vexatiously or in bad faith. Plaintiffs state that they are not offering or soliciting any opinion from Kitto in relation to the insurance policies. Rather, plaintiffs state that Kitto would only offer an opinion that the storm damage he observed would typically be included in an estimate for storm-related property damage. The Court finds that this would be a permissible topic for Kitto to offer an opinion on. With regard to Kitto's opinions regarding vexatiousness and bad faith, plaintiffs state that Kitto does not seek to opine that these adjusters acted in bad faith, but that the adjusters

20

underestimated and/or ignored obvious damage and that a reasonable adjuster would not have ignored this damage. If the Court had found that Kitto's opinions were relevant and reliable he may have been allowed to offer an opinion as to what the American Family adjusters underestimated or ignored. However, because the Court has determined that his opinion should be excluded in its entirety, the Court also excludes any opinion related to what the American Family adjusters missed or ignored.

American Family also seeks to exclude additional opinions offered by Kitto in his April 24, 2017 declaration: 1) All of the damage Kitto observed was caused by the May 10, 2014 hailstorm, 2) new opinions regarding industry standards for insurance adjusters and 3) statements directly contradicting his previous sworn testimony. For the reasons stated above, the Court finds that all of these additional opinions are also impermissible and will not be allowed.

**2. Tom Pendleton**

American Family moves to exclude any expert opinion and testimony that might be offered by fact witness Tom Pendleton. Tom Pendleton was a former employee of the company who installed the roofs and guttering systems for the complex. Plaintiff's state that Mr. Pendleton's testimony does not rise to the level of expert testimony and instead they argue that he should be allowed to testify to facts or events that only he could observe or he could understand due to his specialized knowledge or experience. In reply, American Family states that notwithstanding how plaintiffs characterize Pendleton's testimony, in their Suggestions in Support of their Motion for Summary Judgment, plaintiffs have relied on Pendleton to supply expert testimony. The Court finds that Pendleton's testimony regarding the general nature of roofing practices and

21

any testimony related to his previous work on the roofs for properties would be permissible. However, any testimony related to the roof damage to the properties from the 2014 hailstorm or the feasibility of repairing the roofs would be excluded, as Pendleton admitted during his deposition that he has not been to Brighton Crossing and did not conduct any inspection of the roof damage that occurred due to the 2014 hailstorm.  So, American Family's Motion to Exclude Any Expert Opinion Offered by Tom Pendleton is hereby **GRANTED** in **PART** (Doc. # 133).

**B. American Family's Motion to Exclude Untimely Disclosed Evidence of Repairs**

American Family states that included within two of plaintiffs' briefs are color photographs which depict repairs made to one of the properties with the original color of siding.  American Family states that plaintiffs represent that these repairs occurred several years after plaintiffs received payment from American Family to complete spot repairs of the damaged siding.  American Family seeks to exclude these photos, because evidence of long delayed repairs cannot competently show that there was a matching issue at the time the repairs should have been made and secondly, these repairs and photographs were taken by plaintiffs' consulting expert – Task Construction. American Family states that it sought discovery related to Task, but plaintiffs refused to provide such discovery on the basis of privileged work product.  American Family states that if the Court is not inclined to exclude the photographs and evidence of any repairs, then American Family should be deemed to have waived their privilege related to Task and American Family should be allowed to conduct full discovery related to Task's role in this case.

Plaintiffs state that they are entitled and required to make mitigation repairs to

their properties. Plaintiffs state that the repairs shown in photographs in Doc. # 126-15 were prompted by American Family's third inspection. At this inspection, American Family removed a piece of siding from the building shown in the photographs. Additionally, plaintiffs state that they supplemented their discovery by producing all the photos in their possession. Plaintiffs acknowledge that they utilized a picture of siding mitigation repairs in their briefing that they had not previously produced in discovery. However, plaintiffs state that the use of the photograph was completely harmless in the context of this litigation. Additionally, plaintiffs state that they have not waived the consulting privilege by utilizing the photographs. Plaintiffs state that they have never sought to protect the fact of mitigation repairs although Task performed the majority of the mitigation repairs. Plaintiffs state that they are not aware of any rule or case that would prevent Task from performing the necessary mitigation repairs even though they are a consulting expert. Plaintiffs state that Task has not taken on a new role in this case and they have not designated Task as a testifying expert.

American Family argues in reply that it issued discovery requests to plaintiffs related to TASK's role in the case including requests for information about repairs TASK made to the properties. Plaintiffs objected and American Family filed a motion to compel. Plaintiffs represented that all contact it had with TASK was in a consultant role, including the repairs TASK made to the properties. On September 9, 2016, the court found that because the plaintiffs designated TASK as a non-testifying, consulting expert and because American Family had not shown that there were exceptional circumstances which would prevent it from obtaining the same information, Fed.R.Civ.P. 26(b)(4)(D) prevented disclosure of the information. American Family states that

plaintiffs refused to provide evidence of repairs made by TASK (i.e. the photographs) during discovery but then later attempted to rely on the photographs as the core evidence in support of their matching theory. Additionally, American Family states that plaintiffs have still refused to provide foundational evidence for the photos, such as who at TASK made the repairs, who took the photos, when the photos were taken, what time of day, what lighting conditions were the repairs photographed in, and whether anyone handled or modified the photos. Additionally, American Family states that plaintiffs have not supplied an affidavit from anyone at TASK certifying what repairs were made, how they were made or what product was used.

The Court agrees and finds that plaintiffs' use of the photos depicting repairs made by TASK Construction is improper. Plaintiffs have consistently stated that TASK Construction was only serving as a non-testifying, consulting expert. It was on this basis that plaintiffs refused to respond to interrogatories or produce TASK employees for depositions. It was also on this ground that the Court found that plaintiffs were not required to produce their contract with TASK or produce TASK employees for depositions. If plaintiffs wanted to rely on TASK Construction to fulfill dual roles as both a mitigation contractor on the one hand and a non-testifying consulting expert on the other hand, then plaintiffs should have re-designated TASK as a testifying expert or a fact witness within the discovery deadline. Additionally, plaintiffs could have timely disclosed the photographs and evidence of repairs at issue. Because plaintiffs represented that TASK was only serving as a consulting expert and that any information related to TASK's repairs was privileged and because the evidence was not timely disclosed, the Court finds that plaintiffs cannot rely on the photos of the repairs made by

TASK as substantive evidence in support of their motion for summary judgment. Accordingly, American Family's Motion to Exclude Untimely Disclosed Evidence of Repairs to Brighton Crossing Properties is hereby **GRANTED** (Doc. # 125).

## C. American Family's Motion for Summary Judgment

### Count I – Breach of Insurance Contract

In Missouri, the elements necessary to prove a breach of an insurance contract are the same elements necessary to prove a breach of contract. "A breach of contract action includes the following elements: 1) existence and terms of a contract; 2) plaintiff performed or tendered performance pursuant to the contract; 3) breach of the contract by the defendant and 4) damages suffered by the plaintiff. Braughton v. Esurance Ins. Co., 466 S.W.3d 1, 8 (Mo.App. 2015). The interpretation of an insurance policy is a question of law to be determined by the Court. Mendota Ins. Co. v. Lawson, 456 S.W.3d 898, 903 (Mo.App.2015). Missouri courts read insurance contracts "as a whole and determine the intent of the parties, giving effect to that intent by enforcing the contract as written." Thiemann v. Columbia Pub. Sch. Dist., 338 S.W.3d 835, 839-40 (Mo.App. 2011). "[T]he insured bears the burden of proving coverage under the insurance policy. Fischer v. First Am. Title Ins. Co., 388 S.W.3d 181,187 (Mo.App. 2012). American Family argues that plaintiffs have failed to establish that they are entitled to any additional benefits under the insurance policy with regard to either the siding or the roofs.

### 1. Vinyl Siding

American Family states that in June 2014 when plaintiffs accepted a payment from American Family, it was sufficient to replace the damaged siding on the properties

with the exact same siding in the exact same colors that was originally used when the properties were built.  American Family states that plaintiffs have provided no competent evidence that at the time they accepted the payment, there was a matching issue as to the siding.  American Family states that on July 15, 2014, ITEL Laboratories, sent Task Construction a report indicating that a match for the piece of Vintage Wicker siding was available from the original manufacturer, Alside Supply Center.  (Exhibit M to Defendant's Motion for Summary Judgment).

In response, plaintiffs state that they have expert testimony along with the ITEL reports which show that there is a color mismatch between a new piece of siding and an existing piece of siding. In support of this, plaintiffs cite to the deposition testimony of Robert Kitto and 2016 ITEL Reports. Plaintiffs argue that American Family reads and interprets the ITEL reports differently, and thus there is conflicting expert testimony regarding the reports and the "matching issue."

As discussed above, the Court has stricken the testimony of Kitto, so plaintiffs have no expert who can reliably testify that the colors of the two pieces of siding differ. However, even if the Court would have not excluded Kitto, both the 2014 and the 2016 ITEL reports state "[t]he color is the same as the original color of your siding." Additionally both the 2014 and the 2016 reports indicate that the fading of the original siding was minimal.  So, contrary to plaintiffs' assertion, there is no competent evidence which shows that there was a color mismatch issue as to the three different colors of the siding.

Even if there was evidence of a mismatch or even if it were assumed that the ITEL reports showed that the colors of the new siding were slightly different than the

colors of the original siding, American Family's policies did not require it to replace the siding with "identical" siding nor did the policy require American Family to replace siding that had faded due to normal wear and tear.  The policies stated:

**5. Loss Payment**

   **In the event of loss or damage covered by this policy:**

   **a. At our option, we will either:**
      **(1) Pay the value of the lost or damaged property**
      **(2) Pay the cost of repairing or replacing the lost or damaged property**
      **(3) Take all or any part of the property at an agreed or appraised value; or**
      **(4) Repair, rebuild or replace the property with other property of like kind and quality, subjected to Paragraph d.(1)(e) below.**

**Section I – Property**
**. . .**
   **B. Exclusions**
**. . .**
   **l. Other Types of Loss**
      **(1) Wear and tear**

Thus, the Court finds that American Family has shown that it provided payment to plaintiffs in an amount that was sufficient to replace the damaged siding with the exact same siding in the exact same color from the original manufacturer.  The amount that American Family paid to plaintiffs was sufficient to replace the damaged siding panels in 2014.  Plaintiffs have not shown that there were entitled to any additional payment or replacement of identical siding.  Thus, the Court finds that because American Family paid plaintiffs for replacement of the siding, they did not breach the contract of insurance with plaintiffs.

   **2. Roofs**

American Family also argues that plaintiffs have no competent evidence that repairing the damaged shingles will compromise the structural integrity of the roofs of

27

the properties.  American Family states that both the adjusters and Haag's process for calculating the amount of damage to the shingles (via the test squares) has been rigorously tested and is widely accepted within the industry as being a reliable method for assessing hail damage. In support of their claim that replacement of the *entire* roofs on the properties was necessary plaintiff relied on the testimony and reports of their expert, Robert Kitto and the testimony of Tom Pendleton.  However, for the reasons discussed above, the Court has granted American Family's motion to exclude Kitto's testimony and determined that plaintiffs could not rely on Pendleton's testimony regarding specific damage to the roofs because he was not designated as an expert witness and had not inspected the roofs. Without this testimony, plaintiffs have no evidence that based on the amount of documented hail damage to the shingles, replacing only the damaged shingles would compromise the structural integrity of the roofs.  The Adjusters and Haag both concluded that replacing only the damaged shingles was functionally and economically reasonable.  It is undisputed that American Family paid plaintiffs for the cost of replacing the damaged shingles.  The Court finds that plaintiffs have not shown that they are entitled to any additional payment for the shingles.  Accordingly, the Court finds that American Family is entitled to summary judgment on Count I of plaintiffs' Complaint.

**Count II - Vexatious Refusal to Pay**

Pursuant to Mo.Rev.Stat. § 375.420, a claim of vexatious refusal to pay requires proof: (1) of an insurance policy; (2) of the insurer's refusal to pay and (3) that the insurer's refusal was without reasonable cause or excuse. Dhyne v. State Farm Fire & Cas. Co., 188 S.W.3d 454, 457 (Mo.banc  2006).  American Family never denied that

plaintiffs had suffered a compensable loss under the policies. American Family issued payment to plaintiffs immediately after the loss and offered to make a supplemental payment months before the lawsuit was filed. As discussed above, the Court has found that plaintiffs have failed to show that there were entitled to any additional benefits under the policies. Accordingly, the Court finds that American Family's refusal to provide additional payments was reasonable. Therefore, the Court finds that American Family is entitled to summary judgment on Count II of plaintiffs' Complaint.

Accordingly, for the reasons stated above, the Court hereby **GRANTS** American Family's Motion for Summary Judgment (Doc. # 104).

**D. Plaintiff's Motion for Summary Judgment**

**1. Siding**

In their Motion for Summary Judgment, plaintiffs argue that American Family owes them uniformly matched siding under the terms of the policies. In support of this argument, plaintiffs cite to two cases: Alessi v. Mid-Century Ins. Co. Inc., 464 S.W.3d 529, 531 (Mo.App. 2015) and Cedar Bluff Townhome Condo Ass'n., Inc. v. Am. Family Mut. Ins. Co., 857 N.W.2d 290, 292-94 (Minn. 2014). In Alessi, plaintiffs argue that because the insurer had not defined the phrase "for equivalent construction and use on the same premises" in the policy, the Court used the definition that was most favorable from Black's Law Dictionary: *equivalent* was defined as "virtually identical." Id. at 532. Plaintiff in that case argued that by replacing the siding on the damaged portion of the building with mismatched siding, the insurer was not fulfilling its contractual obligation to replace the damaged portions with "equivalent" materials. The Court stated:

> If Mid-Century's proposed replacement is not "equal in value," then Mid-Century has not fulfilled its contractual obligations to provide a loss

Case 4:15-cv-00887-FJG   Document 137   Filed 03/22/18   Page 29 of 33

> settlement of the replacement cost for equivalent construction and use, regardless of whether only the northern elevation was damaged. Conversely, it is possible that there is siding on the market that is in fact "nearly identical" to the existing siding on the other elevations of the property. Under this scenario, replacing the damaged siding on the northern elevation with nearly identical siding is an equivalent replacement meeting Mid-Century's contractual obligation.

Id. The Court determined that under the facts before it, it could not answer the question of whether replacement siding is virtually identical or if a house with mismatched siding is equal in value to a house with matching siding. The Court found that these are questions of fact for a jury to decide. In the instant case, it is an easier question because there is not a question regarding whether replacement siding exists or is available. The original siding is available from the original manufacturer in the same colors that were originally used when the properties were built. The ITEL reports state that the original siding is a match and there has been only minimal fading to the original siding.

Plaintiffs also reply on Cedar Bluff Townhome Condo Ass'n. to support their argument, arguing that the Minnesota Supreme Court found that American Family was obligated to replace all of the siding panels on each of the condo association's twenty buildings to achieve a reasonable color match. However, in that case, it was determined and the insurer conceded that the replacement siding panels could not be matched in terms of color. The Minnesota Supreme Court stated:

> Thus, we conclude that on the spectrum of resemblance, "comparable material and quality" requires something less than an identical color match, but a reasonable color match nonetheless. This determination is consistent with case law in other jurisdictions. . . .Therefore in accordance with the plain meaning of the policy language, we construe the phrase "comparable material and quality" to mean a reasonable color match between new and existing siding when replacing damaged siding.

30

Id. at 294.  The Court finds that these cases actually support American's Family's position.  It is undisputed that the exact same siding in the same three colors used when the properties were built is still available from the original siding manufacturer.  The ITEL reports from both 2014 and 2016 state that "the color is the same as the original color of your siding."  Therefore, the Court determines that American Family provided payment for replacement siding which was of "like kind and quality" and that was a reasonable color match.

### 2. Roofs

Plaintiffs state that they are entitled to replacement of the entire roofs where a piecemeal repair of certain shingles would deteriorate the integrity or functionality of the roofing system.  In support of this argument, plaintiffs cite to the testimony of Tom Pendleton.  However, as explained above, the Court will not consider this testimony as Mr. Pendleton was never designated as an expert witness and never inspected the roofs for damage. Plaintiffs also cite to the reports of Kitto.  However, as discussed above, this opinion has also been stricken.  Thus, plaintiffs have no evidence in support of their claim that replacing only the damaged shingles would damage the functional integrity of the roofs. American Family's adjusters and Haag both concluded that replacing only the damaged shingles was functionally and economically reasonable.  It is undisputed that American Family paid plaintiffs for the cost of replacing the damaged shingles. Plaintiffs have failed to establish that they are entitled to any additional amounts of compensation for the damaged roofs.

### 3. Other Soft Metal Damage

Plaintiffs also argue that they are entitled to replacement of the metal

accessories, gutters, metal roofs on the carport, vent covers, flashing, downspouts, balcony kits, pipe covers, roof valleys, and other exterior items impacted and dented by the hail.  In response, American Family states that both Norris and Barrett testified that hail damage to soft metal generally is covered under replacement cost policies and neither suggested that coverage hinged on whether the damage was "functional" or "cosmetic."  American Family states that the real reason that the soft metal damage was not originally included was because plaintiffs' property manager, Danny Davis told the adjusters that he was not worried about this damage and told them multiple times not to include it in the estimate.

Q. So at this point, just to make sure I understand it, you don't dispute that you told them to exclude the soft metal damage on the roof?  I do understand what you are saying - -
A. Yeah.
Q. – that you're saying you didn't quite understand it all –
A. I –
Q. – but I want to be clear that you did tell them it didn't need to be included?
A. I did make that statement in the context of I knew that we needed to get to everything, but my focus was to get the roofs fixed quickly so we didn't incur more hail damage.
Q. Okay. And later that day, I believe – and if you need to see the claim file notes, there were some emails with you, the follow-up email asked – I think Lynn Urzendowski asked you if you wanted the soft metal damage to be included from the carports that they identified. And you said no, not to include it; is that correct?
A. Yes.

(Davis Depo. pp. 59-60).

Additionally, Haag's estimate for the repairs included replacement of the metal roofs on the car ports and also replacement of 22 turtle vents. (Deft's Exh. H, O'Connor Depo. p. 238; Plaintiff's Exh. 12). Thus, American Family states that plaintiffs have been fully compensated for the covered hail damage.  The Court agrees and finds that soft metal damage was covered under the policies and plaintiffs have been compensated for

this damage.  Accordingly, the Court hereby **DENIES** plaintiffs' Motion for Summary

Judgment (Doc. # 101).

## IV. CONCLUSION

Accordingly, for the reasons stated above, the Court hereby **DENIES**  Plaintiff's

Motion for Summary Judgment (Doc. # 101), **GRANTS** defendant's Motion for Summary

Judgment (Doc. # 104); **GRANTS** defendant's Motion to Exclude Plaintiffs' Experts

(Doc. # 106); **GRANTS** defendant's Motion to Exclude Untimely Disclosed Evidence of

Repairs (Doc. # 125); **GRANTS** defendant's Motion to Strike Declaration of Robert Kitto

(Doc. # 127) and **GRANTS** in **PART** defendant's Motion to Strike Expert Opinion and

Testimony of Tom Pendleton (Doc. # 133).

Date: March 22, 2018                                   **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                                 Fernando J. Gaitan, Jr.
                                                      United States District Judge

33